**In re Carl BAGWELL and Ila Mae Bagwell, Debtors.**

**FIRST ALABAMA BANK, a Corporation, Plaintiff,**

v.

**Carl BAGWELL, Defendant.**

**Bankruptcy No. 90–02955.
Adv. No. 90–0815.**

United States Bankruptcy Court, N.D. Alabama.

March 6, 1991.

David Lee Jones, Guntersville, Ala., for plaintiff.

T.J. Carnes, Albertville, Ala., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS BY THE COURT

**L. CHANDLER WATSON, Jr.,**
Bankruptcy Judge.

*Introduction:*

The above-styled bankruptcy case was commenced in this Court by the voluntary petition under title 11, chapter 7, United States Code, of Carl Bagwell, also known as "Speedy" Bagwell (hereinafter referred to as the "debtor") filed on March 12, 1990,

---

and continues thus to be pending before the Court. The above-styled adversary proceeding was commenced herein by the plaintiff, First Alabama Bank, a corporation (hereinafter referred to as the "bank"), against said debtor, seeking to have the Court determine nondischargeable an unpaid prepetition loan owed by the debtor to the bank, in the sum of $11,000.00, plus interest and attorney's fees, and enter a judgment thereon in its favor and against the debtor, pursuant to the provisions of 11 United States Code, Section 523(a)(2)(B), by its complaint filed June 1, 1990. The two counts of plaintiff's complaint were consolidated by the Court, in response to the debtor's motion to have the Court dismiss Count II, and the adversary proceeding came on before the Court for an evidentiary trial on February 7, 1991, which was completed and after which this matter was taken under advisement by the Court, which will enter a judgment in favor of the bank and against the debtor, based upon the Court's findings and conclusions hereinafter set forth.

*Findings of Fact:*

Based upon the documentary and oral evidence presented at the trial, the debtor's bankruptcy petition and related, verified schedules of liabilities and assets (of which the Court took judicial notice), and the clerk's notice to creditors herein, dated March 21, 1990, which sets forth notice of the petition, the date of the meeting of creditors, and other information concerning this case, together with the clerk's dockets for the case and the adversary proceeding, of which the Court now takes judicial notice, the Court finds that a preponderance of the evidence in this proceeding establishes the following relevant facts:

1. The debtor's petition and the bank's complaint were filed and are pending as hereinabove stated, and the first date set for the meeting of creditors, pursuant to 11 U.S.C. § 341(a) was April 5, 1990;

2. The debtor's schedules of his liabilities and assets, which accompanied his voluntary bankruptcy petition, are shown to have been verified by him and his spouse (the latter being a joint petitioner in this case) on March 7, 1990, and showed secured debt of $139,423.89, owed respectively to two other banks, Ford Motor Credit [Co.], and an individual;

3. These schedules, after an amendment by the debtor on April 26, 1990, (which added $4,011.85), showed unsecured debt owed by the debtor in the sum of $59,430.39;

4. The debtor's original schedules showed assets (substantially but not entirely encumbered) consisting of real property stated to have a value of $184,500, and personalty stated to have a value of $11,443.00, as to which the debtor and his spouse claimed a real property (homestead) exemption of $10,000.00 and a personalty exemption of $1,943.00;

5. Thus, the schedules, if looked upon as a personal financial statement, showed the debtor and his spouse to have a negative net worth or an insolvency, at or about the date of bankruptcy (March 12, 1990), of $2,911.28;

6. On September 8, 1989, the bank made a loan to the debtor in the sum of $11,000.00, to bear interest at an annual rate of 12.75%, with the principal and interest due and payable in the sum of $11,699.33 on March 9, 1990;

7. The loan was made without security for its repayment and subject to a written agreement for the debtor to pay reasonable costs (including a reasonable attorney's fee) not to exceed 15% of the unpaid debt, in the event of the debtor's default in payment and if the bank were required to refer the loan to an unsalaried attorney for the bank, with a verbal requirement that the debtor repay to the bank a previous loan on which the debtor owed $4,123.12, which payment the debtor made without delay;

8. At the time of the loan here in question (September 8, 1989), the debtor was engaged in a business of buying and selling real estate and timber and had 31 years of experience in this type of business and was serving a "term" as a member of the Marshal County, Alabama, Board of Equaliza-

tion, which considered and acted upon complaints of taxpayers in that county concerning the values placed upon their property in that county for taxation purposes, and he had served one "term" on the City of Albertville (Alabama) Board of Adjustment which considered requests by real property owners for variances to be granted from the city's zoning requirements for real property;

9. The loan of $11,000.00 was made by the bank through one of its officers, who, at the date of trial, had eighteen years experience as a bank loan officer, with six years of it being with this bank;

10. Upon entertaining the debtor's request for this loan of $11,000.00, the bank required the debtor to present his financial statement, which is identified as plaintiff's Exhibit "B" and which the debtor submitted to the bank prior to its approval of his requested loan;

11. This financial statement showed that the debtor owned an interest (sometimes the full title and sometimes an undivided interest with others) in eleven parcels of real property as to which the debtor's interest was stated to have a value of $402,916.00, with cash in the sum of $4,500.00, automobiles worth $20,000.00 and furniture and (other) personal property valued at $37,000.00, bringing the total value of the debtor's assets to $464,416.00;

12. The debtor's financial statement showed that he had a salary [sic.] of $50,-000.00 per annum and showed liabilities, all secured by real estate mortgages, in the sum of $166,500.00, which left a stated net worth to the debtor of $271,916.00;

13. The debtor's financial statement included the prior loan owed to the bank, which was stated to be in the sum of $4,000.00 and to be secured by property in the adjoining DeKalb County;

14. The debtor's financial statement substantially and falsely exaggerated the values of his assets and substantially and falsely exaggerated his net worth at the time when the bank was considering whether to make the unsecured loan which he had requested of the bank;

15. Acting through said loan officer, the bank considered the debtor's financial statement, dated September 8, 1989, prior to making its decision to grant the loan and relied upon the debtor's financial statement, including the debtor's gross exaggeration of his net worth, in agreeing to make such an unsecured loan to the debtor, all as the debtor had intended that the bank should;

16. At the time of the bank's loan of $11,000.00 to the debtor, real estate values in and around Marshal County, Alabama, where the debtor owned interests in real property, had declined significantly, and they continued to decline through the time that the debtor filed his bankruptcy petition, and during that interval, the debtor sold some parcels of his encumbered real property and applied the proceeds to the related encumbrances; and

17. At the time of the trial, no payment upon the principal or interest had been made against said loan by the bank to the debtor of $11,000.00.

*Conclusions by the Court:*

On September 8, 1989, the debtor represented to the bank that he had a financial net worth of $271,916.00. On March 12, 1990, according to the debtor's sworn representations to his creditors, the trustee, and the Court, this net worth had shrunk to almost $3,000.00 below zero—a reduction of approximately $274,827. While the March, 1990, figures are taken from the joint schedules which the debtor filed with his wife, they must be taken as furnishing information almost entirely concerning his debts and assets. The debtor neither contended nor offered any proof that the disparity in *his* represented net worth of $271,916 on September 8, 1989, and *their* represented absence of any net worth by March, 1990—some six months later—was due to any fluctuation in his wife's financial condition.

From September to March, debt (all secured) changed from $166,500 to $139,-423.89 secured and $59,430.39 unsecured, for an increase of $32,354.28, to $198,-854.28. Realty declined in value from

$402,916 to $184,500, for a decrease of $218,416. Personalty declined in value $50,057, from $61,500 to $11,443.

Under section 727(a)(5) of title 11, United States Code, a debtor is denied a discharge if the debtor is determined to have failed to explain satisfactorily any loss of assets or deficiency of assets to meet the debtor's liabilities. Here, however, the disappearance of value in the debtor's assets is used by the bank to invoke the provisions of 11 U.S.C. § 523(a)(2)(B),[1] so as to have the debt owed to it excluded from the discharge granted to the debtor in this case. The bank, in reliance on the debtor's financial statement, which he furnished to it, changed its position from a creditor holding a secured debt of $4,123.12 owed by this debtor to a creditor owed an unsecured debt by him of $11,000.

The debtor contended that the disparity in his net worth at the time of the loan and that of him and his wife six months later—showing a decrease of almost $275,000—was due: (1) to a decrease in value of his real estate holdings; coupled with (2) his having sold various tracts or parcels of real estate at depressed prices for payment on debts secured by the sold assets. This explanation was inadequate to substantiate a six months's decline in value of his real estate of 54% and of his personalty of 81% and a six month's increase in his liabilities of 16%. The increase in debt occurred over a half-year period, during which the debtor claimed to have been liquidating real estate holdings and paying the proceeds on secured debt (which decreased $27,076.11 or

16%). During the six-month period, unsecured debt went from zero to $59,430.39.

Neither party undertook to trace the values or the disposition of the individual items included in the assets claimed by the debtor at the beginning of the period to the end of the period or to the point of liquidation. The Court is less-well enabled to do that than they and finds no responsibility for it to undertake such a minute examination of the debtor's transactions.[2] Notwithstanding that, a due consideration of the 101% nose dive in the debtor's net worth over a six-month period, in the light of the other evidence presented to the Court, results in the settling of a conviction upon the Court that the debtor intended that the bank be deceived by his substantially false financial statement and, thus, obtained a loan from the bank. The supposed change in the debtor's net worth over a six-month period is far better explained by a conclusion that the financial statement was grossly false than by the debtor's assertion that he was merely a victim of decreasing real estate values. Also, the effort at trial by the debtor to create a "callow youth" excuse for the exaggerations of his financial statement favorable to his getting the requested loan do not "play well" in the face of his years of experience of dealings in real estate and with obtaining bank loans, together with his service on two governmental boards dealing with values or uses of real property. If the debtor was in fact only a victim of falling real estate prices, he failed to go forward with sufficient evidence to disestablish the picture which the bank painted of his fraud in obtaining the loan.[3]

1. 11 U.S.C. § 523. Exceptions to Discharge.
 (a) A discharge under section 727 ... of this title does not discharge an individual debtor from any debt—

 .    .    .    .    .

 (2) for money, property, services or an extension, renewal, or refinancing of credit, to the extent obtained, by—

 .    .    .    .    .

 (B) use of a statement in writing—
  (i) that is materially false;
  (ii) respecting the debtor's or an insider's financial condition;
  (iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

 (iv) that the debtor caused to be made or published with intent to deceive; ....

2. Substantial portions of copies of documents offered as exhibits in this proceeding were illegible, which the Court calls to the attention of plaintiff's counsel. In this proceeding, such a deficiency did not affect its outcome; however, the Court might in an appropriate circumstance reject partially-illegible exhibits, with a crucial effect upon the outcome of the trial.

3. *Grogan v. Garner,* — U.S. —, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

The bank will recover a nondischargeable debt for the principal debt of $11,000.00, interest to date at the contract rate, and a filing fee of $120.00. There was no evidence what a reasonable attorney's fee in this matter would amount to, and none will be recovered.